So with that, I'll call the United States of America Ex Rel, the International Brotherhood of Electrical Workers, Local 98 v. The Farfield Company, and I would call upon Ms. Friedman. Thank you, Your Honor. My name is Susan Friedman, I'm here representing the appellant, The Farfield Company, and I would like to reserve five minutes for rebuttal, please. That will be granted. There are, of course, a series of issues that have been raised by the appellant and that are argued in the brief, and I don't know that we will have adequate time to address all of them. Some would appear to have more priority, if not be more substantial than others. I would ask you if you would address first what you've set forth as at least the first, perhaps the primary issue, and that is the retroactivity question. Yes, Your Honor. Thank you. As set forth in the brief, and as I know all of Your Honors are aware, there is a quote split in the circuits with the decisions of the Sixth Circuit and some of the other circuits finding that the interpretation of the revised or amended statute should mean that cases in the applicable section, the claims refers to cases as opposed to claims under the Farfield Company. Yes, but there is indeed a circuit split as to what is the intended meaning of claims, and the Eleventh, Fifth, and Ninth have, in opinions, taken a position consistent with your preference, while the Sixth and Seventh have gone the other way, and I would suggest to you that the opinions upon which you rely are, I don't want to say not as well reasoned, but I will say more briefly reasoned. In fact, there's some footnoted material which takes up the position you wish to take, as opposed to the much more robust discussion of Judge Gibbons with the Sixth Circuit decision and Judge Wood with the Seventh Circuit decision. Isn't the stronger case here, if we're looking to the circuit split and the opinions, that the better case, the stronger issue, the more robust position really is set forth in the Sixth and Seventh Circuit opinions? We would respectfully disagree with that. We would note that the Sixth Circuit, it was the same case that the Supreme Court had reversed them on, the Allison-Engin case, and obviously they are trying to undo, or hope that Congress had undone, the decision in that case. But didn't Congress undo it, though? Isn't that exactly what happened when Congress amended this statute? Specifically, they were trying to undo Allison, and they said, look, the Supreme Court just misread our intent when they decided the Allison case. Given that, how do we side with your argument? Well, very respectfully, they can undo Allison-Engin and that decision, but not retroactively, and that's the real question in this case. How do we understand that? If they amend the statute to negate the Allison decision and clarify congressional intent, what would preclude them from undoing the Allison decision, especially when they specifically made the effective date of the amendment two days before Allison was decided? I mean, they were really sending the signal to the Supreme Court, in their opinion, got it wrong. At the same time, Congress usually is not going to be retroactive, especially in a case where it's questionable whether it's an ex post facto law, where it certainly has been raised and can be argued that it's ex post facto and is punitive in nature. We may get to that, that the punitive in nature is a piece of all this. Right now, we're talking solely about interpretation of these terms. And if we disagree with your argument on retroactivity, doesn't that pretty much resolve it? Why can't Congress make it retroactive if it is not punitive, and if it's totally a civil measure as opposed to a criminal measure? Congress could do that, but in this case, there are two sections with two different phrases. Very respectfully, although the courts, the Sixth Circuit argued and the ones that followed its lead, argued that the use of the word claims doesn't make any sense. Talking about a claim under the False Claims Act, I would respectfully submit it does make sense. Well, how? That's probably what troubles me more than anything about your position. And I think we would all agree, irrespective of how we come out, that context matters. So if you import the defined term claim into the retroactivity provision, it seems to me that what you're left with is something like requests or demands for payment under the False Claims Act. But that can't be right. Does it make sense to say that a contractor's That can't be. I don't think the statute needs to be read that way. The statute can be read when it's referred to claims under the False Claims Act, that they would be the claims that would be actionable under the False Claims Act. I mean, we're dealing with a statute here that's titled the False Claims Act. Okay, but they would only be under the False Claims Act if what they are are false or fraudulent claims, right? Correct. But they would still be the types of claims that would be actionable and falling under the False Claims Act. We have a statute called the False Claims Act. So the use of the word claims in the retroactivity provision should not have just been by chance. And especially when the next session talks about cases. And yes, we're aware that, oh, well, they'll pass. They came up two different times in two different ways. But it's still the specific use of the word claims when you're dealing about the False Claims Act. And I think that it would make sense in trying to undo Allison-Engin that they're not going back beyond the time. They're going back and making sure they cover anything after Allison-Engin. So don't make it the same day. You can make it two days before, whatever reason. I don't know that anybody knows why they made it two days before. Well, that is, I would agree to this point that the two days before language may not be the usual or standard or common way of stating retroactivity. But the proximity, the calendar proximity to the Allison-Engin decision seems to me to answer the question. I don't see how you can look at it any other way. They didn't take a calendar dartboard and just end up with that two days before as a coincidence. But I think it can be read to mean that they still would have to be claims, the actionable claims under the False Claims Act that were pending on or after that date of Allison-Engin, not the ones that are going to proceed. Judge McKee and Judge Ambrose, do you want to ask some more questions on this retroactivity question? I don't want to foreclose those. At the same time, I know we have other issues to explore. Well, I just asked one quick question. I mean, what do you think Congress was trying to do in enacting the 2009 amendments, if not completely undo Allison-Engin by the Supreme Court? Undo it, but not necessarily make it apply to the cases that came before. The Supreme Court's decision that it would apply to cases that were already, that were there, were pending, which doesn't apply in this case, and claims that came afterwards. You have people, it's essentially, and we will argue that it's a punitive statute. It should not be retroactive to actions that occurred before. And in the Section 4, F1, you're saying that claims cannot mean cases or civil actions? That is correct, that it means claims as they would be defined in the false claims act. It has to be the false or fraudulent claim that is pending on or after that date. With Judge McKee and Judge Ambrose's consent, or at least if they don't have additional questions on retroactivity, I'd like to move to the misclassification of employees issue that you raised. Could you just briefly indicate what your contention is with respect to misclassification? Yes, Your Honor. May I make one brief statement with respect to retroactivity, just bringing to attention? In the Escobar case, which is on materiality, which is what it was cited for in the briefs, there is a specific quote in the Escobar case that talks about the punitive nature of the false claims act. And it's found on, if I can find this, the quote is, Congress also has increased the act's civil penalties, talking about all the different amendments to the false claims act, so that liability is, quote, essentially punitive in nature, end quote, citing Vermont Agency of Natural Resources versus United States XRL Stevens, a U.S. Supreme Court 2000 case. Defendants are subjected to travel damages plus civil penalties up to $10,000 per false claim, section 3729A. So I would just raise that as a note that this is a commentary from the Supreme Court of the punitive nature of the false claims act case. With respect to the misclassification, in this case, it's a misclassification of tests, of specific tests. It's very important to note we are not raising credibility issues. We had stipulations of the parties. They were based on the testimony, the deposition testimony, of the plaintiff's expert witnesses, especially Mr. Lee. So do you agree that the Department of Labor's prevailing wage determination here was derived from a particular CBA? What I would agree is, because in this case, the testimony of Mr. Leach, their expert witness, the head of the IBEW, was that both under local union practice, his words, those are not my words, it's a quote, under local union practice in the Philadelphia area, both the Labor's Union and IBEW Local 126 did the work. I'm not sure how you've answered my question. I'm sorry. I'm trying to find a source, and it seems that there are two basic sources. It could be from local practice. It could be from a particular CBA, or maybe one informs the other. But if it is a particular CBA, is that CBA in the record? All of the collective bargaining agreements are in the record. There were four that covered the time, or three that covered the time period of the project, because it lasted four and a half years. What my chambers found, and please tell me if we're in error on this, was that the earliest one that appears in the record was signed on December 3, 2001. But it seems that it would be the CBA that was used for the December 3, the December 3, 2000 CBA, with Local 126. So is the applicable one in the record? Maybe missing something. Yes, every collective bargaining agreement of local... So to go back to the prevailing wage determination, they based wage rates on Local 126's collective bargaining agreements, as well as the Labor's collective bargaining agreements. They're both in the prevailing wage determination. And Local 126's collective bargaining agreements, there were four, because one was amended partly through. That covered the entire length of the project, are all in the record, and were all admitted. We made a specific point of covering the entire period of the project and having every collective bargaining agreement in there. And the relevant provisions didn't change, by the way. So that I understand what you're arguing, and I may not be. Are you arguing, or did you argue in your briefing, that local industry practice is only determinative of classification, to the extent that it comports with the terms of a relevant CBA? Many of the classification cases and decisions, to talk about... I am trying to answer your question. You're starting out by not answering my question. I'm asking you about your position, not what some cases say. Okay. When the issue on the classification and use of the position is within one union, here, IBW Local 126, the collective bargaining agreement governs, and Fry Brothers even references that, and other cases do. And you would never use local practice other than to expand upon a term that wasn't in the contract. Some of the cases that are cited deal with two different unions and a jurisdictional dispute. So you don't have one collective bargaining agreement. The laborers have their own collective bargaining agreement. The IBW has its own collective bargaining agreement. They're relevant in determining which union does the work as a matter of local union practice. And that's why I couldn't answer, is it in the collective bargaining agreement? Because there isn't a collective bargaining agreement that governs both the laborers and the IBW, or the laborers and the plumbers, or the laborers and the carpenters. And in this case, the testimony was that both the laborers union and IBW Local 126 posted the work in question. Judge McKee, do you have any questions on the classification issue here? Are you muted, Judge McKee? I am, I'm sorry. Two questions. We have said, I think in Fry Brothers, where collective bargaining agreements form the basis of road determinations, the practice of local signatory unions is conclusive under department precedent. Now, are you saying that that only applies when there's more than one collective bargaining agreement that applies to the job? What I'm saying, in the cases of saying which union does the work, they have to look to local union practice, because there's not a collective bargaining agreement that would cover it, different unions. With respect to when you're dealing with classifications that are all under one collective bargaining agreement, as we have in this case, the groundmen and the journeymen are all within one collective bargaining agreement. The language of the collective bargaining agreement governs, just like the wagering from the collective bargaining agreement do, and the case laws, Fry Brothers is going to reference that. Most of the cases did not find specific case law on that, and all the cases cited, none of them contradict the specific terms of the collective bargaining agreement, let alone the stipulations of the parties. This is something that I don't think would be controversial, but you can help me with this. I was confused by the term, what I interpreted in a lay sense, as opposed to what it seems to apply, and that was when we're talking about pulling wires, I associate that of just literally pushing wire, or fishing wire, if you will, in a residential situation through a conduit, not connecting it to a hot line or connecting the hot pole, the neutral pole. Am I incorrect? Is pulling included within the connection to the power source, or is it just physically pulling the wire through the conduit? Physically pulling wire through the conduit. We did include a couple photos in the record, not all the photos that were there, and it shows 6, 8, 10 people with the foreman watching, the journeyman, electrician foreman watching, where they're all pulling wire. It's heavy wire, it's a long distance, it's brute force, it's horsepower. You need a lot of people to do it. They all work together. Nothing was energized. Farfield did not do any hot or energized work, SEPTA did all of its own hot work. Okay. Judge Ambrose, do you have questions on the classification issue here? You argue that the Department of Labor and SEPTA could not have cared about the classification and the payment on this Wayne project, Wayne Junction project, because they investigated Farfield and they didn't identify any classification issues, but is there any evidence that the Department of Labor or SEPTA looked at Farfield's classification and payment of workers? Yes, it is specifically in the record, it's in the record on the appeal. We have in approximately 70 so pages from the audit, and in the U.S. Department of Labor audit in 2004, and in 2004, there's specific correspondence between Brian Johnson, who was the auditor for the U.S. Department of Labor, asking about the use of groundmen and laborers on the project, and an answer that went back. So we specifically looked at the use of groundmen and laborers on the project, halfway through the project, and the only thing they told Farfield, they didn't find any issues under the Davis-Bacon Act, other than the Labor Day holiday, where the four carpenters should have been paid Labor Day at the prevailing wage rate. So they did specifically look at the use of groundmen and laborers on the project, and did not raise any issues whatsoever with respect to classification. All right, thank you. Before we move to the issue you have raised concerning materiality, one question regarding the DOL. What effect, if any, is there to the fact that they declined a referral here? Does that impact on this case's cognizability in the district court? Your Honor, I was prepared to argue from the beginning, but no, very respectfully, I probably might not have gotten to it, that this case, it's not a false claims act case. It doesn't belong here. It never belonged here. It should have gone to the U.S. Department of Labor, who are equipped to deal with complex worker classification cases. They didn't want it. They didn't want it 15 years later, because it was too old. But the IBEW took out the Davis from the witnesses, their employees, in 2008, just a few months after the project was over, and in the middle of two of the other projects that they filed in their false claims act case, they could have turned all that over to the Department of Labor, and the Department of Labor would have investigated, and if it found this classification, all of the money would have gone to the employees, whereas none of it goes to the employees here. So they should have done it then. Then in 2012, we filed a motion to dismiss, said it's a complex worker classification case. IBEW knew exactly what the issues were. They were on all the affidavits, and they put it in their complaint, and they told the court and represented to the court that it was not a complex classification case when it was. Then when Judge Stengel, when they asked for expert witnesses five years later, and we said, well, if they need experts, it must be a complex worker classification case, he referred it, told them to refer it to the Department of Labor. They did nothing for a year. It wasn't until it was reassigned to Judge Kearney in September of 2018 that Judge Kearney basically gave the IBEW approximately 30 days to refer it to the Department of Labor. So our position is this, and if the Department of Labor had handled it, they never would have found intent or reckless disregard when they had already audited and basically given Farfield a pass on the classifications, and if they found anything, it certainly wouldn't have been material, and they would have done an estimate of damages. So we submit that this is nothing and has never been anything more than basically economic extortion by IBEW against a non-union contractor. We're well over time, but I would like to both ask you to speak to your materiality issue, the materiality of the false certified payrolls, and give my colleagues an opportunity to explore anything they wish before we turn to the other side. But didn't your clients' managers and your clients' leadership have an understanding that the government attached or would attach considerable importance to the classification of workers, and that therefore the accuracy of payrolls certifying workers were properly classified? We have tasks here. We know that the supervisors or managers intentionally violate the Act. That's what the court says. We have specific tasks of what ground manure helpers can do, and although, yes, they understand there can't be intentional violations of the Act. There was no intentional violation of the Act here, and it is not uncommon. I'm sorry. What about reckless disregard? The only basis for the reckless disregard was that Farfield didn't track all of the different specific tasks by the minute that the ground men did, but they understood the ground manure helpers. They're an electrical worker helper to the journeymen. They had journeymen, several usually, on every single crew, so they can help them do anything they needed to do other than hot work of which there is virtually none. But you have McGee's testimony that, look, anybody on the job can do any work without regard to whether they're ground men or line men or laborer. Anybody out there can do anything, and that would suggest that people can, I'll use the term pull wire, a ground man can pull wire even though that should be something that an electrician would do, and they're associating that with connecting it to the hot source. You're saying that may be wrong. One, I think, important clarification is nobody ever testified that they could do anything on the job. They testified that a ground man can do anything a line man can do. They are in the same, they're both electrical workers under IBW Local 126. The ground man is the journeyman's helper. So therefore, it is totally sensible and consistent that the helper can do anything the journeyman can do as long as they have a journeyman on the crew, and that's exactly what the collective bargaining agreement says. The only thing they can't do, as I said, are the hot work and the aerial work of which there is virtually nothing by far field. So in this case, if you think a ground man has 100 tasks the ground man can do, you're not going to keep records or direct your foreman that the ground man can't do those tasks. And as I said, the interpretation is totally consistent with the collective bargaining agreement and the stipulations. The party stipulated that they could, the ground man could assist in all these tasks. Well, if the journeyman are right there on the crew and they're all pulling wire, they're assisting. I don't know how, actually, without them physically pulling the wire, they assist them pulling wire. So they're pulling wire. They can do that. They're not doing it on their own. There was never a time when one employee went out and pulled the wire. Judge McKee and Judge Ambrose, we did give each side 20 minutes here, and Ms. Friedman has rebuttal, and we're well over the remaining 15. But I want to make sure that each of you, I'll recede, that each of you has an opportunity to ask any additional questions you wish before we turn to Mr. Gelman. Okay. I had a question on Ms. Friedman's use of the term punitive, but we can cover that in rebuttal. I'm sorry, I didn't hear that. I had a question on the whole aspect of whether or not this is punitive, but we can cover that in rebuttal. Judge Ambrose? And I had a question on damages I can cover in rebuttal. All right. Very well. Thank you. We'll have you back on rebuttal, Ms. Friedman. Thank you, Your Honor. Thank you. Good morning. May it please the Court? My name is Mark Gelman. I represent the Appellee IDW Local 98. A number of issues were covered. And first we covered retroactivity. It's probably best to start there. And Ms. Friedman did... Can I ask an overarching question at the outset? Yeah, sure. And this may frame to some extent the answers. Obviously, the typical case that one gets in the False Claims Act is where the government pays out on a fraudulent claim like Medicare or Medicaid. This is just the opposite of that. The government here doesn't even have to pay. Here the employees are injured. They don't recover. Here the amount was $160,000 roughly that could have been paid. And the amount of damages far, far, far exceeds that. How does this work? I mean, is the purpose of the False Claims Act counterintuitive? That doesn't mean that necessarily you win or lose. It just seems that it's... I've never had a case like this in my 20 years on the Court. And let me just add to that. One of the ways it seemed to me to be counterintuitive is who the relator is and to whom actually would go any of the recompense here. Good point. So I suppose the question is, why are we here, to sum up your honors? Well, I don't normally delve in anything that metaphysical, so I would rather... This is a fascinating question, though, isn't it? It is, especially in your case, Judge McKee, but we'll discuss that later. The nature of the cycle, I submit. All right. Yeah. How does this fit into the FCA, traditional FCA mode framework? Because it does seem apparently to Judge Ambrose and me that this is at least a rather atypical case. And with that, I would not agree. Nevertheless, it is a False Claims Act case, just because it doesn't fit under the standard, let's say, the typical Medicare case. You have the government bargaining with an entity under the broader False Claims Act framework, government bargaining with an entity and not receiving their end of the bargain based upon a misrepresentation or some entity. That is basically what you have here. Here, the government bargained with Appellant Company for effectively two things. One is the work itself, the electrical work, which it did perform. But there was a second component to this bargain, and that was for the bargain for public benefit. That is the payment of the prevailing wage. The maintenance of that prevailing wage is a broader public benefit for which the government did not receive its end of the bargain. That's effectively what we have here. That's the same question that your honors are raising. We're similar to that which was raised in the Circle C construction case in the Sixth Circuit in 2016, where you had the two components of that, to use the word again, that phrase, of the benefit. Here, the bargain for benefit of the prevailing wage to maintain, which addresses the broader public policy of the Davis-Bacon Act, to keep a level playing field so that it doesn't become a race to the bottom by contractors and public work contracts, is an essential component of why the bidding process takes place, why the certification process by way of the Davis-Bacon Act, the certified payrolls which lie at the heart of our claims here, are an integral component of what cannot be extricated. It is one and the same. Just because the work was performed, and just because the payment was made for the price that was contained within the contract, that doesn't mean the government received everything that it paid for. That's the loss. Right. Let me then return to the retroactivity question. Ms. Friedman alluded to the presumption here against retroactivity as per Landgraf and Schumer. My more narrow question here is, even assuming that there has been a clear declaration by Congress, clear statement of retroactive intent, what about the scope of the intended retroactivity? Well, the scope is full retroactivity to effectively close the donut hole. I mean, your honor asked what was Congress trying to do, one of your honors, I apologize. The reason I ask the question is because so much of this case, at least as it even if we assume, or even if we decide that the presumption doesn't apply here, that there's clear intent of retroactivity. Retroactivity as to what? Retroactivity as to how much? Well, retroactivity that all cases that were filed as of the effective date of FERA, of the retroactivity legislation, which was two termination in Allison Engine, can continue essentially to, the stated intent contained within the legislative history of FERA, I think says it all, quote, clarifying and correcting erroneous interpretations of the law that were decided in Allison Engine. That's what Congress said they were trying to do in enacting FERA. So essentially, as stated in the Seventh Circuit, that the date of June 7th, and your honor was correct when he suggested that a dart wasn't thrown at a calendar to determine June 7th, 2008. The date of retroactivity was that it can eliminate the approach taken in Allison Engine without reopening judgments that were already final when Allison Engine was decided. Essentially, so there was no prejudice to any party with regard to when it were to file its case. Now, getting to the claims versus cases, and I think your honors all focused on what is the most obvious element to rebut the more general presumption of statutory construction. It says claim, it must mean claim. There are a number of reasons, all stated in our brief, as to why Congress intended claims to mean cases, and just inartfully used that term. The most obvious and glaring being it makes no sense otherwise. The language, the plain meaning of the text is absurd if claims were to mean claims under the False Claims Act, which does not exist. It would not refer a notion, a legal concept that does not find a place in this world. It would not only be absurd, but it would circumvent the purpose of the legislation. Let me ask judges McKee and Ambrose if they have questions or follow-up questions as to the retroactivity issue before we move on. Judge McKee, go ahead. No, no, I'm content. Okay. If Congress meant for the 2009 amendments under the False Claims Act to apply retroactivity to all cases pending as of June 7, 2016, why wouldn't it have used the word cases as it did in the very next section of the statute? Well, it would have made everybody's life a lot easier, wouldn't it have, had they? I think it's important to note that the sections which are found next to each other, where the two terms are used, were drafted by two separate houses of Congress at two separate periods of time. It's also, I think, helpful to note that as the Circuit explored in the remand case of Allison Edgent, Congress did use the term claims to mean lawsuits throughout. So you're suggesting that any presumption from uniform usage here should not apply because of the two separate bodies having drafted two different parts or more than two different parts of the legislation? Yes, Your Honor, that is one of many factors. To rebut the presumption, you can look at a number of factors. Again, the absurdity of the one interpretation, that the fact that in the Senate report to FERA, they referred to cases using the word claims. There are a multitude of factors that may be considered to rebut the presumption, and we assert that it is easily rebutted in the text. With regard to the industry practice, and if Your Honor would like me to move on to that subject matter, that was kind of the second issue that was addressed previously. Maybe you can just finish up the last part. Why should we assume that the use of the word claims and not cases was intentional? Usually, the people, especially at the General Counsel's Office that advises on every bill, that they're very careful in terms of how they draft. And the response, you know, it just may be we do throw off. I mean, I don't know. I mean, he wouldn't be here. Why shouldn't they make the assumption the other way, that claims and cases are different, and it was done intentionally? Well, I would suggest that, and, you know, I have nothing wiser to opine than the courts in the Sixth and the Seventh and the Second Circuits who explored this issue, you know, in a fulsome manner, as opposed to the kind of the footnote aside address in the Ninth and Eleventh Circuits, because of the words have meanings. We recognize that, and that is why we also concede that there is a presumption of statutory construction where the words have meanings, but that may be rebutted, and for the reasons I cited, in addition to others, we believe that that presumption is adequately rebutted. It would defeat the entire purpose of the legislation otherwise. I'm sorry. That's a conclusion. So give me, fill in the conclusion. It would defeat the presumption for that to get you to that conclusion. Well, the intent is to, if you substitute the word claims with cases, as we believe was the intent in the legislation, it would effectively, as was addressed with Ms. Freedman, correct the problem with the ruling in the Supreme Court in the original Allison-Engin. I mean, that was the intent, right? That's the way our system works. The courts, you've done this, we can't work around the statute. The statute says this. This is our interpretation. And then Congress has the opportunity, as they took here, to correct that, to say, okay, the courts had a problem with it. We will enact this retroactive clarification legislation. Well, as is often the case, Congress probably could have been more clear here, but we're dealing with the language they gave us. Could we then move to the misclassification issue? And I'd like to know if it's your position that a contractor on a federally funded project always has to discuss the local worker classification practices with union signatories to a CBA. Is that a must? Is that a requirement? If. There's always an if, Your Honor. And this first question that you asked, Mr. Freeman, on the subject, is the wage determination based upon the local CBAs? The answer is yes. That's clear within the wage determination in the record in this case. Not just the local 126 CBA, but for all the crafts and the trades, including the laborers. Now, because that is the case, decades of departmental judicial precedent hold that the I don't like to interrupt, but you're taking a long route in answering a question that I thought was susceptible to a fairly direct answer. Is the upshot of your position that a contractor is always going to be at the mercy of a signatory union? No, to the contrary, Your Honor. They are at the mercy of the industry practice. And I create that distinction because the language of the CBA is not the driving force, as appellant would have this core belief. Yes, the local industry practice. Now, they can gain knowledge. To your exact question, do they have to talk to the unions? Well, they should if they have any questions. There are other manners and mechanisms to by which a contractor bidding on a public works project or getting a public works product can become aware of the industry practice. But the short, I apologize, the attempt at a short answer to your question, Your Honor, is they need to be made aware. They need to conduct any reasonable inquiry within their power to determine what the industry practice is, because they are bound by that industry practice. So do they have to directly talk to the local unions? That's one way to do it. What if a CBA that formed the basis for a prevailing wage determination included a detailed schedule setting forth all of the, each type of permitted and prohibited work? And that schedule affirmatively indicated that groundmen could lay conduits or pull wire. Would Farfield still need to inquire, make this outside inquiry, the signatory union? Yes. About local practice? Yes, the Farfield would still need to, would still be bound by the local area practice, and they would need to be familiar with the local area practice. Now, Your Honor, in that example. If I may go on, the Midfield makes a very forceful argument that that only applies, if I'm understanding correctly, where there's more than one collective bargaining agreement, more than one union. If the CBA is unambiguous on its face, if it doesn't have a clause which it easily could, could incorporate within it in terms of job description of permitted work, local practice, it could easily do that. If it doesn't do that, then why would she write that when you have multiple, when you only have one collective bargaining agreement pertaining to that to its terms, which is unambiguous. If the CBA is unambiguous, you don't do that. That would be a very sound argument based on contract principles. Your Honor, because that is an exception that frankly does not exist. There is no lone CBA theory that I'm aware of. It doesn't exist. It's not consistent with departmental policy. It's not consistent with judicial decisions. And it's not frankly consistent with 45 years of practice. It is in fact the industry practice that controls. Now, not to say the CBA is irrelevant. It is a factor to be considered. Now, there was nothing under the example, if you say, hey, if it's clear enough in the CBA, that's the only thing that must be considered. Under that scenario, there's nothing to prevent a union and a contract association from effectively bargaining away in a nefarious manner, to be a bit dramatic, bargaining away to tailor away from prevailing wage practices or certain wage levels. You put a cost in the contract to include that. That's really easy. Well, a contract can say what it says, but that is not what controls. That's not what the case law, my brothers in 45 years of precedent notes that you need to look to the area of practice, but you can't leave it to just the CBA. We are not, this is not a contract interpretation case. This is not a law of the shop case. This isn't a grievance arbitration to see if there was a violation of the CBA. It's the area of practice. That is the law. And that is almost a half precedent. This is in derogation of traditional contract laws, which are traditional collective bargaining. Of course, this is consideration of the Davis-Bacon Act, a violation of Davis-Bacon. That's why you need to look at the area of practices. You can't rely upon an outlier or somebody who has the, perhaps the interest of its members or its employees in the best incorporate all pertinent and controlling laws and regulations and statutes. Davis-Bacon is incorporated within that. Davis-Bacon then looks to controlling industry practice. That's a much easier way to get at this than simply saying, you forget about the practice of bargaining. I'm really arguing that the industry practice is incorporated into the collective bargaining act. The Davis-Bacon Act, which is incorporated by the CBA's reference to, or being complicit with all applicable laws and regulations. But I don't know that, I don't know that I necessarily agree that the CBA essentially, the terms of the CBA themselves effectively closed the book on what can and cannot be done. I mean, and that was a, that was considered by the, by the special master and his findings, in fact, and adopted by the district court that there, you know, whether there is, there is not a conflict between the area of practice here and the CBA is up for dispute. It's not, it's not for this court to consider because the, the, the, the issue of what the factual finding based upon, you know, eight days of testimony and 16 fact witnesses, including plus an expert witness on the area of practice is that the area of practice is X. That that's a finding there's not clear error with regard to that finding. So any discussion as to, you know, pulling conduit or laying conduit or pulling wire that was addressed at the trial court. The, but the terms of the CBA don't necessarily in this case. And that, and that, I think that that's why the law holds as it does is that you, you, you, you can't delineate a, a, a, an industry practice through language as precise as it may be. And again, as judge Kearney noted in his opinion, that if Farfield's arguments regarding the CBA trumping local custom or tailoring local customer to be credited, quote, parties could contract around its obligations under the DBA to pay its workers for the work performed. You need to take a broader, more holistic approach as to what applies and doesn't apply. And again, it should be noted that there was no rebuttal evidence by appellant with regard to what the industry practice was. Judge Ambrose, would you like to get in on this issue? No, I just have a general question at the end, just the relating to there were five projects and you decided to litigate only one. Why was that? Well, it was a result of, of discovery. Your honor, that that's where the facts brought us it's not an uncommon occurrence for a case to start as something and end up as something else. That wasn't that, not to suggest this case contorted from, you know, into a, a, a, a completely different manner. The claims on the, on the five projects were all interrelated, common set of core facts, identical legal theory, but we whittled away or through, through the process and years of, of delving into facts the other projects were laid by the wayside. We were left with a single project, the largest project. But again, the other project, it was, as I noted, a common core set of facts, identical legal theory. So it, there was no material change in, in the prosecution of the case. Just by the time we went to trial you know, the, the, the Wayne junction project was, was last man standing, so to speak. Let me, let me ask you to follow up on, you mentioned materiality, material. What are the strongest that the government and the violations here as material? I'm sorry, could you repeat that your honor? What are the strongest indications to you that the government and or SEPTA would have viewed the violations here as material? Would not view the violations as material? Would have, would have. Oh, oh, oh, certainly. Well, well, I think the two strongest factors here are, and they were, it was kind of the framework set forth in the Escobar case is whether or not the government regularly pays these types of claims with knowledge that there was a violation. And the answer to that is of course, no, there's not a can point to. And secondly, whether or not there is a recognition on the part of the app, that these are the types of claims for which compliance is required in order to, for the government to make payment. And that that's quite, quite obvious here. You have the, of course, the regulations themselves, Davis-Bacon and the contract language incorporates that, which calls for the accurate providing certified payrolls in order to avoid withholding, which is mandatory in this instance, or discretionary debarment. Before my time runs out, I wouldn't know. That may be the strongest answer that withholding and the possibility of debarment would suggest in pretty strong terms that it would be material. Oh, oh, certainly your honor. And, and, and moreover to that point, Farfield itself, and this was, this was touched upon earlier in a question posed to Ms. Freeman, Farfield itself was well aware of its obligation to serve, to provide a truthful and accurate certified payrolls with regard to classification and claims to have taken great pains to do so. Noting in the trial testimony from its executives that the wage requirements are crucial and debarment violation of the wage laws would be catastrophic. It would put Farfield quote, out of business. In on page 43 of its opening brief presented to this court, it noted that since almost all of its work has been, is, and has been public projects, getting debarred would put Farfield out of business. That to, to, to your question as to what evidence of materiality the government would, would, would advance that argument. It is the knowledge, the admission by appellant itself, that it's not going to get paid and it may be put out of business if it doesn't provide certified accurate payrolls, which it does not. But if SEPTA or the department of labor believed the violations were material, would they have flagged that during their investigations? In the, in the DOL audit, your honor, is that what you're referring to? Yes. Okay. Well, and, and that's, that's really a factual question and that's an argument that's been advanced repeatedly by appellant in this case, but, but the devil's in the details. There are distinct factual findings by the fact finder in this case who heard all the evidence, who considered the breadth of the audit that was conducted in 2004 and found that the department of labor, that there was no evidence in the record, not a scintilla of evidence in the record, the department of labor considered the work performed by groundmen and laborers. And effectively the, the issues at play, you know, that were, that were presented by way of this trial in this matter, we're not considering the DOL audit. So there was that there is no evidence, and this is again, a factual determination made through a multiple, one of the 202 findings of fact issued in this case that the DOL did not, there's no evidence the DOL had noticed of any misclassification. So their willingness to pay is effectively a non-fact that's a red herring. How, how, how were these, how were these discrepancies, these under billings discovered then? Through the relator. And it's the nature of the, the, the key Tom case that's circling back to the very first question that was, that was posed to me, my understanding, and this is record evidence, as I best recall it is that the local union through a right to know requests obtained documents and conducted a, an independent investigation. And they discovered the mis misrepresentations made in the certified payrolls. All right. Thank you, Mr. Gilman. But before we turn to Ms. Friedman's rebuttal, I want to ask you a question that is the same or similar to what I intend to ask her on rebuttal. And since you don't have a second bite at the apple, I should give you an opportunity to answer it now. Why should we apply Mount Clemens when in this case, employees are not going to be receiving the recovery and that fact that, uh, that recognition was discussed with emphasis in the Mount Clemens opinion. I don't believe that, that I'm thinking of a more particular way to say it. Uh, other than makes a difference in this case, your honor, um, in terms of, uh, the burden shifting, um, the, the employees, the, the representation of the employees made the prima facie showing, which then would shift the burden to the employer, um, to, you know, effectively negative the reasonable inference. There wasn't, there was a, a reasonable inference made by the employees themselves. I'm, I'm not familiar, your honor, to be quite frank of a, the, a concept, uh, within Mount Clemens or, or, or its progeny, you know, it's around for quite some time, you know, uh, 80 years or so, um, where the, the actual payout component, um, is, is affected by the, um, let me just read you the language from the opinion out of the Supreme court, which prompts my question, the remedial nature of this statute and the great public policy, which embodies militate against making that burden and impossible hurdle for the employee do regard must be given to the fact that it is the employer who has the duty under section 11 C and the act to keep proper records of wages and hours. And it goes on to see, say employees seldom keep such records themselves. So I'm, what I'm asking you and what I'm anticipating Ms. Friedman will speak to is, uh, just whether or not we should distinguish Mount Clemens from the situation before us, because it is not the employees who really have the stake here. And I'm glad you read me that language, your honor. And that, that certainly doesn't, doesn't affect my response, the burden and the public policy, um, advanced in Mount Clemens and, and, and, um, referenced, uh, in, in that portion of the, of the, of the opinion is, is to, to effectively not burden the employee. The, the employer should not be prejudiced through the employer's malfeasance or negligence, or, you know, by not maintaining proper records. That doesn't answer the question because that's the concern. The employee is not getting, it makes me wonder, do unions keep these kinds of records? I assume that they don't, but I just don't know. Employers work on a, on a, on a public, I'm sorry, I don't understand the question, but the answer is no, because the union is not the employer. From the Mount Clemens that the chief just read, the court was concerned about the burden shifting, uh, requirement here because employees don't keep these kinds of records. Therefore, when the employer is stopping this record keeping, they should be put to the task of justifying the way that the work was built. And that's why the shifting burden comes into play. That makes me wonder. I know employees don't keep records. I'm not sure employee unions keep records either, or maybe they do. I just don't know whether or not unions keep these kinds of records in terms of what work was done and by whom. I assume they don't. No, they certainly do not. I mean, I, I can't speak for every union in every instance in, in, in the world, but the, the, the, the union bargaining unit representative, they're not on the job site. They're not responsible. They're not the employer. They don't direct the workforce. Uh, they, they don't pay the employees. The employer, particularly on a public works project has not as an obligation to maintain adequate, uh, work records, um, that the Mount Clemens keeps their feet to the fire, so to speak. So that if there is a claim made after the fact, and I don't, I believe it's a distinction without a different trial or whether the claim is made to directly, uh, financially benefit the employees or benefit the United States government or the relator, uh, that, that again, I think is, is, is, is a non, non-factor, non-consideration. All right, Mr. Gelman, uh, Judge McKee, Judge Ambrose, do you have additional questions that Mr. Gelman before we've turned to rebuttal? No, no, no questions. Just an observation for Mr. Gelman is this, and I'm not sure if this pertains to Ms. Fried or not. I don't remember it, but one argument always goes smoother when the attorney lets the judge ask the question. This, today's not as bad as yesterday when you couldn't get rid of an edgewise exchange, but I would just, uh, ask the counsel when, when you hear a question coming, stop and let us ask the question. Because of the virtual format, I can't tell if there's a lag time in the audio or not, but there are times I thought maybe myself or one of my colleagues was on mute because the attorney who was getting a question was not stopping at all to listen to the question. I just tossed that out as a word of procedure. Or, or if you even see a judge, irrespective of the technology asking a question, it's probably best to stop and let the question be. I understand that. Thanks for the advice. I apologize to the extent I was encouraged. We're dealing with two different locations that the technology is somewhat challenging, but we're all, we're all dealing with obstacles here. Thank you very much. You have rebuttal. And if I may, Ms. Friedman, before I recede and, and turn the time over to my colleagues on rebuttal, uh, let me ask you the Mount Clemens question or similar Mount Clemens question. Uh, I, uh, I take it that, uh, Mount Clemens has been applied, uh, or that you're aware that has been applied in Davis bacon cases, uh, before the DOL, right? Yes, your honor. All right. So let me follow up on Mr. Gelman's response to me. Uh, and I'm not sure he touched on this, but it may be something I'm especially sensitive to as a judge and especially as a judge who wants to serve for a fair number of years on first instance courts. Mount Clemens is a, is a method for approximating damages, obviously. And therefore it does facilitate the presentation of proof and the resolution of an issue where there may be some difficulty in evidence that is probative of that issue. Admittedly, it may be something of an evidentiary shortcut with this, at least by virtue of the burden shifting. But, but first of all, doesn't that aid the fact finding process for the court? And secondly, if it does, why should Mount Clemens then not be just as applicable to a situation like this in which the employee's stake is really not what is at issue? In a Davis bacon or Fair Labor Standards Act case, obviously Mount Clemens came up under the Fair Labor Standards Act. And yes, it has been applied in Davis Bacon Act cases. In those cases, you have the U.S. Department of Labor who comes in, doesn't audit. The employer doesn't have the required records. And all of the cases say, as your honor pointed out with Mr. Gelman, that the reason for shifting the burden of proof is so that the underpaid employee or worker gets any money that is due to that worker. That's the underlying rationale in all the Davis Bacon Act cases, as well as Mount Clemens. But in order to shift the burden, the employees have to put on, Department of Labor has to put on at least some reasonable testimony and information from which a reasonable inference can be provided, which we're saying is not done here. But getting back to the specific question that you asked, this is a false claims act case. It's punitive, whether you want to say that it's punitive in the sense of whether it can be redacted or not. Maybe that's the point where I should just interrupt because I think Judge McKee wanted to inquire into that, maybe other areas as well. But if I'm correct, it might be the appropriate point for Judge McKee to inquire. Thanks, Chief. I was struck by, Ms. Friedman, by your presentation, your initial presentation, which was very well articulated and very cogent and thought out, which is not to say it's convincing me that you're right, but it was a really well presented legal argument. But you seem to suggest that the thing that makes it punitive is the damages. But that can't be right. Maybe I'm wrong. Maybe that's not what you're arguing. But if that were the case, then every time a statute provides for recovery of triple damages, we then get into a punitive statute, which there's just so many of them out there that cannot possibly be right. Is that what you're relying upon, the punitive damages here? Maybe the debarment's another aspect of that? With respect to shifting the burden of proof on plaintiffs, what occurred in this case is that the plaintiff put on no evidence whatsoever from the employees as to even a guesstimate as to how much time they spent doing any of the specific tasks that they allege only journeymen should do. And then they said, well, Farfield, you don't have the records. Well, first of all, so they're shifting the burden of proof under a statute, either the Fair Labor Standards Act or the Davis-Bacon Act. At a point in time, years and years and years later, where not only under that statute that they're shifting the burden of proof under so they can give the money to the workers, the statute of limitations has not only expired, the recordkeeping requirements have also expired. And Farfield didn't even know the project was being investigated for anything until well after the statute of limitations and the recordkeeping requirements had expired. The Fair Labor Standards Act is two or three years. Davis-Bacon Act used three years for the recordkeeping requirements. And then from that, they take using FACES, which is an accounting tool, which eight hours of the entire day are charged to in many cases, and saying, okay, we'll give you credit for the fact that there's an hour and a half when they're not even on site or they're not even working. But every other productive hour under that FACES code, six and a half hours a day, because you don't have records ten years later, we're now going to charge that to you and say that you owe underpayments for all of those hours. And then on top of that, we now have treble damages and civil penalties on an estimate that So in that case, it really, really does make it punitive. First of all, I think one of the important points are the special master found he couldn't really tell, it was a close question, whether it was journeyman lineman work or labor work. So it's $159,000 if it's lineman work and it's $52,000 if it's laborers work. Even in the Davis-Bacon Act itself, it had down that laborers could lay conduits right in the prevailing wage determination. All right, Ms. Friedman, I don't want to cut you off completely in rebuttal. We're well over that time. And I would like to comment before I inquire my colleagues, if they have additional questions. In true third circuit tradition, although we extended our default 15 minutes per side to 20 minutes per side, we've now spent just about an hour and 10 minutes on this case. That is consistent with third circuit tradition, tradition being that we don't pay great deal of attention to the clock around here. And that's, that's a good thing. Judge Ambrose, questions? No, the only thing I add to what you just said is I would have gone longer. I knew that, which is why I'm sitting here now. Judge McKee, any further questions? Well, I do have one or two, one we can't answer today. And that was the initial question. Why are we here? But forget that a second, in the metaphysical sense. You always want to get into ontology, don't you? I kind of do, actually. But what you just said, Ms. Friedman, about laying conduits, so that I'm clear, is laying conduit mean just laying down, I'll call it the tunnel, the piping, the tubing? Or does it also include pulling the wire through the tubing, although not activating the wire? Laying conduits, a piece of plastic pipe, can come in different lengths, 10 foot, 20 foot, that's what they were using on this project. Laying conduit is just laying it in the ground. Okay, okay. And they have, I don't, I probably haven't, it lays on little plastic things, and it's not right on the ground. And they may tie together. There's a better word for it, and I'll find that out as soon as I sit down at my counseling table. But, and then they may have tied it, but it's not pulling of the wire. The pulling of the wire is another thing, but pulling wire is just pulling wire. It's not energized, it's not hot, it's just a lot of big, heavy, long wire that they'll get a whole lot of people want to pull at the same time. Okay. So, but, and it's not. Thank you very much. Thank you very much, Your Honor. Ms. Friedman. And thank you to all of counsel. This is, as my colleagues and I have expressed in various ways, something of an unusual case. I won't go so far as to say an outlier, but it, but it is an unusual case contextually, and in some other ways. But a very interesting one, a well-argued one. We thank you all for your excellent briefing and for your very helpful arguments here. We'll take the matter under advice. Can we get a transcript, Brooks? Yes, a good idea. Good idea. We will do that. Thanks very much. This matter is concluded. Thank you, Your Honor.